GIBSON, DUNN & CRUTCHER LLP
Katherine V.A. Smith, SBN 247866
ksmith@gibsondunn.com
Elizabeth A. Dooley, SBN 292358
edooley@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

GIBSON, DUNN & CRUTCHER LLP
Jason C. Schwartz (*pro hac vice* application forthcoming)
jschwartz@gibsondunn.com
Greta B. Williams, SBN 267695
gbwilliams@gibsondunn.com
1050 Connecticut Ave., N.W.
Washington, D.C. 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

Attorneys for Defendant VOX MEDIA, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

|  |  |
|---|---|
| TAMRYN SPRUILL, individually and on behalf of all those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>VOX MEDIA, INC., a Delaware corporation (d.b.a. SB NATION); and DOES 1 to 10 inclusive,<br><br>Defendants. | CASE NO. 18-cv-06807-PJH<br><br>**VOX MEDIA, INC.'S OPPOSITION TO PLAINTIFF'S MOTION TO REMAND**<br><br>Date: February 20, 2019<br>Time: 9:00 a.m.<br>Dept: Courtroom 3, 3rd Floor<br>Before: Hon. Phyllis J. Hamilton<br>Trial Date: None Set<br>Action Filed: September 21, 2018 |

# TABLE OF CONTENTS

Page

I.  INTRODUCTION .................................................................................................... 1

II.  BACKGROUND .................................................................................................... 2

III.  LEGAL STANDARD............................................................................................ 3

IV.  ARGUMENT ........................................................................................................ 4

    A.  Removal Was Proper Because the Class Exceeds 100 Individuals ............................ 4

    B.  Removal Was Proper Because CAFA's Amount-in-Controversy Requirement is Satisfied Based On the Allegations in Spruill's Complaint ...................................... 5

    C.  Further Evidence Confirms that the Amount in Controversy Exceeds $5 Million.................................................................................................................... 6

        1.  Plaintiffs' Minimum Wage Claim Alone Places Nearly $5 Million in Controversy. ....................................................................................... 7

        2.  Plaintiff's Meal and Rest Break Claim Places Another $100,000 in Controversy. ..................................................................................... 17

        3.  Plaintiffs' Wage Statement Claim Places More than $200,000 in Controversy. ..................................................................................... 19

        4.  Attorneys' Fees Further Increase the Amount in Controversy. ..................... 19

    D.  Defendant's Calculations Significantly Undervalue the Amount in Controversy ...... 20

V.  CONCLUSION .................................................................................................... 21

Gibson, Dunn & Crutcher LLP

Page(s)

**Cases**

*Campbell v. Vitran Exp., Inc.*,
471 F. App'x 646 (9th Cir. 2012) ....................................................................................18

*Cohn v. Petsmart, Inc.*,
281 F.3d 837 (9th Cir. 2002)...........................................................................................6

*Dart Cherokee Basin Operating Co. v. Owens*,
135 S. Ct. 547 (2014) .......................................................................................................3

*Donald v. Xanitos, Inc.*,
No. 14-CV-05416-WHO, 2015 WL 1774870 (N.D. Cal. Apr. 17, 2015) ........................6

*Falk v. Children's Hosp. Los Angeles*,
237 Cal. App. 4th 1454 (2015) .......................................................................................19

*Garza v. Brinderson Constructors, Inc.*,
178 F. Supp. 3d 906 (N.D. Cal. 2016) ...........................................................................17

*Guglielmino v. McKee Foods Corp.*,
506 F.3d 696 (9th Cir. 2007)............................................................................................4

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998).........................................................................................20

*Helm v. Alderwoods Grp., Inc.*,
No. C 08-01184SI, 2008 WL 2002511 (N.D. Cal. May 7, 2008)....................................10

*Hernandez v. Nuco2 Mgmt., LLC*,
No. 117CV01645LJOJLT, 2018 WL 933506 (E.D. Cal. Feb. 16, 2018) ..........................8

*Ibarra v. Manheim Investments, Inc.*,
775 F.3d 1193 (9th Cir. 2015).................................................................................1, 2, 3, 4

*Jasso v. Money Mart Express, Inc.*,
No. 11-CV-5500-YGR, 2012 WL 699465 (N.D. Cal. Mar. 1, 2012)...............................19

*Korn v. Polo Ralph Lauren Corp.*,
536 F. Supp. 2d 1199 (E.D. Cal. 2008)........................................................................4, 6

*Lewis v. Verizon Commc'ns, Inc.*,
627 F.3d 395 (9th Cir. 2010)............................................................................................1

*Mackall v. Healthsource Global Staffing, Inc.*,
No. 16-cv-03810-WHO, 2016 WL 4579099 ..................................................................16

*Taylor v. United Rd. Servs., Inc.*,
313 F. Supp. 3d 1161 (E.D. Cal. 2018).......................................................................5, 10

Gibson, Dunn &
Crutcher LLP

Page(s)

**Statutes**

28 U.S.C. § 1332(d) ..................................................................................................3

28 U.S.C. § 1441 .......................................................................................................3

28 U.S.C. § 1453 .......................................................................................................3

Cal. Code Civ. Pro. § 415.30 ....................................................................................2

Cal. Labor Code § 204(a).....................................................................................8, 18

Cal. Labor Code § 226.7 ..........................................................................................16

Cal. Labor Code § 512(a)..........................................................................................16

Cal. Labor Code § 226(e)..........................................................................................18

Cal. Labor Code § 1194 ....................................................................7, 9, 14, 15, 16

Cal. Labor Code § 1194.2 ............................................................................7, 15, 16

Cal. Labor Code § 1197.1 ...............................................................................7, 8, 16

**Other Authorities**

City of Oakland, California, *January 1, 2018 Minimum Wage Increase*, *available at*
    http://www2.oaklandnet.com/Government/o/CityAdministration/d/MinimumWage
    /OAK051451 ......................................................................................................11

City of Santa Monica, *Santa Monica's Minimum Wage Increases July 1 on the Way to*
    *$15 by 2020* (June 27, 2017), *available at*
    https://www.santamonica.gov/press/2017/06/27/santa-monica-s-minimum-wage-
    increases-july-1-on-the-way-to-15-by-2020 ....................................................11

Los Angeles Municipal Code, Chapter XVIII, Article 7,  Los Angeles Minimum Wage
    Ordinance, Sec. 187.02, Payment of Minimum Wage To Employees, *available at*
    http://clkrep.lacity.org/onlinedocs/2014/14-1371_ord_183612_07-19-15.pdf............................11

San Francisco Administrative Code, Chapter 12R, "Minimum Wage Ordinance", Sec.
    12R.4. Minimum Wage, *available at*
    http://library.amlegal.com/nxt/gateway.dll/California/administrative/chapter12rmi
    nimumwage?f=templates$fn=default.htm$3.0$vid=amlegal:sanfrancisco_ca$anc=
    JD_12R.4...........................................................................................................11

State of California Department of Industrial Relations, *History of California Minimum*
    *Wage*, *available at* https://www.dir.ca.gov/iwc/MinimumWageHistory.htm ................................10

# I.   INTRODUCTION

Defendant Vox Media's Notice of Removal calculated the amount Plaintiff Tamryn Spruill's Complaint placed in controversy based on her allegations, including the number of hours Ms. Spruill allegedly worked, the amount she was allegedly paid, and her contention that her claims are typical of the class. *See* Dkt. # 1; *Lewis v. Verizon Commc'ns, Inc.*, 627 F.3d 395, 399 (9th Cir. 2010) ("In determining the amount [in controversy], we first look to the complaint."). In its Notice, Vox Media denied (and continues to deny) that Plaintiff's claims have any merit, but it averred, for the purposes of meeting the Class Action Fairness Act's jurisdictional requirements, that Plaintiff's allegations place more than $5 million in controversy. *See Ibarra v. Manheim Investments, Inc.*, 775 F.3d 1193, 1198, n.1 (9th Cir. 2015) ("Even when defendants have persuaded a court upon a CAFA removal that the amount in controversy exceeds $5 million, they are still free to challenge the actual amount of damages in subsequent proceedings and at trial. This is so because they are not stipulating to damages suffered, but only estimating the damages that are in controversy.").

In her Motion to Remand, Plaintiff challenges Vox Media's reliance on the allegations in the Complaint to calculate the amount in controversy, arguing that her role as "associate editor," her stipend payment, and the number of hours she worked are *atypical* of the class. Dkt. #23 at 7-10, hereinafter "Mtn.". Noticeably, however, nowhere in her Motion does Plaintiff directly assert that the amount in controversy is less than $5 million. Indeed, some of the arguments Plaintiff makes in her Motion suggest that Vox Media's Notice may have *underestimated* the amount in controversy. *See* Mtn. at 2 (noting that some Content Contributors were paid a lower monthly stipend, and thus would have a lower offset to allegedly owed wages, than Ms. Spruill).

While Vox Media believes its initial assumptions and calculations were well founded based on the allegations in the Complaint, out of an abundance of caution, Vox Media has recalculated the amount in controversy in a manner that addresses each of Plaintiff's concerns. In so doing, Vox Media has adopted a number of Plaintiff's own suggestions about methods for calculating the amount in controversy based on individual data of putative class members. For instance, Plaintiff suggests that "segregate[ing] Content Contributor's by job title [] would provide support for a reasonable estimate of hours worked" (Mtn. at 7); in connection with this Opposition, Defendant has done just

Gibson, Dunn &
Crutcher LLP

that. Plaintiff suggests that "the amount each Content Contributor was paid in stipend is essential to the calculation of Plaintiff's minimum wage claim" (Mtn. at 7), and Defendant has now used individualized data to calculate an estimated average stipend amount. Plaintiff states that "Content Contributors work more hours around game days and work fewer hours in the off-season" (Mtn. at 8)—Defendant's minimum wage and meal and rest break damage calculations now only include in-season weeks. Finally, Plaintiff argues that Defendant's calculation of the minimum wage rate should have been individualized, rather the calculated across the class—Defendant has now estimated the average minimum wage rate for each individual based on the time period they performed services for Vox Media.

Not surprisingly, even with the use of individual data, necessitated because of the lack of commonality between class members, the amount in controversy still exceeds $5 million. Even excluding the following—any alleged minimum wage or meal and rest break damages for performing services during a team's off-season; any purported overtime damages; and any damages for an alleged failure to reimburse expenses—the amount in controversy is more than **$6.3 million**. Because Defendant has carried its burden to establish the amount in controversy exceeds $5 million by a preponderance of the evidence, and in light of Congress's intention that "CAFA [is] to be interpreted expansively" in favor of federal jurisdiction, *Ibarra*, 775 F.3d at 1197, this Court should deny Plaintiff's Motion.

## II. BACKGROUND

On September 21, 2018, Plaintiff filed the instant action in the Superior Court of Alameda County. Service on Vox Media was complete October 11, 2018. Cal. Code Civ. Pro. § 415.30, subd. (c); Smith Removal Decl. ¶ 3, Exh. E. On November 9, 2018, Vox Media, Inc., removed this case to federal court. Dkt. #1. On December 5, 2018, Plaintiff filed a Motion to Remand the case to state court, arguing that CAFA's requirements are not met in this case. *See* Mtn.

Plaintiff Tamryn Spruill seeks to represent a putative class of "[a]ll Content Contributors who created and/or edited written, video, or audio content for an SB Nation team site in California at any time within the four years prior to the filing of the Complaint in this action, were classified as independent contractors, and were paid compensation directly from Vox, excluding Site Managers

Gibson, Dunn & Crutcher LLP

who opt-in to *Bradley v. Vox Media, Inc.*, No. 1:17-cv-01791 (D.D.C.)" Compl. ¶ 32. Plaintiff alleges that she and other Content Contributors are properly considered employees of Defendants, although Vox Media classified them as "independent contractors." Compl. ¶¶ 1,2. Plaintiff asserts that she and the putative class members are allegedly: "entitled to unpaid minimum wages"; "entitled to unpaid overtime wages"; "owed meal and rest period premiums"; "owed statutory damages for failure to provide itemized wage statements"; "owed reimbursement of business expenses"; and "entitled to restitution and injunctive relief under the Unfair Competition Law." Compl. ¶ 3. The Complaint alleges seven causes of action on behalf of the putative class arising out of the tasks Plaintiffs performed for Vox Media. Compl. ¶¶ 36-70.

## III.    LEGAL STANDARD

Removal was proper pursuant to 28 U.S.C. §§ 1441 and 1453 because this Court has subject matter jurisdiction over this action and all claims asserted against Defendants pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d).

Under CAFA, federal courts have original jurisdiction over class actions where the amount in controversy exceeds $5 million in the aggregate for the entire class, exclusive of interest and costs; the putative class action contains at least 100 members; and any member of the putative class is a citizen of a state different from that of any defendant. *See* 28 U.S.C. §§ 1332(d)(2), (d)(5)(B), and (d)(6).

Where, as here, "a defendant's assertion of the amount in controversy is challenged," the "procedure" is for "*both sides* [to] submit proof and the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied." *Dart Cherokee Basin Operating Co. v. Owens*, 135 S. Ct. 547, 554 (2014) (emphasis added); *see also Ibarra*, 775 F.3d at 1198–99 (remanding "to allow both sides to submit evidence related to the contested amount in controversy" and noting that "the Supreme Court has said that both sides submit proof and the court then decides where the preponderance lies"). "The parties may submit evidence outside the complaint, including affidavits or declarations, or other 'summary-judgment-type evidence relevant to the amount in controversy at the time of removal.'" *Ibarra*, 775 F.3d at 1197 (quoting *Singer v. State Farm Mut. Auto. Ins. Co.*, 116 F.3d 373, 377 (9th Cir. 1997)). "Under this system, CAFA's

requirements are to be tested by consideration of real evidence and the reality of what is at stake in the litigation, using reasonable assumptions underlying the defendant's theory of damages exposure." *Id.* at 1198.

A defendant seeking removal "bears the burden to show by a preponderance of the evidence that the aggregate amount in controversy exceeds $5 million when federal jurisdiction is challenged." *Ibarra*, 775 F.3d at 1197. The preponderance of the evidence standard merely requires a showing that it is "more likely than not" that the amount in controversy is more than $5 million. *Guglielmino v. McKee Foods Corp.*, 506 F.3d 696, 699 (9th Cir. 2007). While "a defendant cannot establish removal jurisdiction by mere speculation and conjecture" or with "unreasonable assumptions," the presentation of "'evidence combined with reasonable deductions, reasonable inferences, or other reasonable extrapolations'" is sufficient. *Ibarra*, 775 F.3d at 1197 (quoting *Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 754, 771-72 (11th Cir. 2010)). "[E]vidence may be direct or circumstantial," and "a damages assessment may require a chain of reasoning that includes assumptions." *Id.* at 1199; *see also Korn v. Polo Ralph Lauren Corp.*, 536 F. Supp. 2d 1199, 1204-05 (E.D. Cal. 2008) (defendant's "burden is not 'daunting,' as courts recognize that under this standard, a removing defendant is *not* obligated to "'research, state, and prove the plaintiff's claims for damages'" (emphasis in original) (citation omitted)).

## IV. ARGUMENT

Plaintiff does not dispute that removal was timely or that diversity is met. Nor does Plaintiff allege that there is any other exception to CAFA removal that would apply in this case. As such, the only questions before this Court are whether Defendant has shown by a preponderance of the evidence that the class exceeds 100 individuals and that the amount in controversy exceeds $5 million. It has.

### A. Removal Was Proper Because the Class Exceeds 100 Individuals

Plaintiff indirectly suggests that the putative class may be less than 100 individuals, arguing that Vox Media's estimate of putative class members is unreasonable because it is based on individuals' most current address in the Paylocity database, rather than the historical addresses for each individual. But the best available evidence, combined with logical inferences from that

1    evidence, shows that the putative class is likely into the 200-300 person range.

2       James Naylor, the current Manager of Accounting Operations at Vox Media, reviewed the

3 Paylocity data for each individual.  See Declaration of James Naylor ¶ 5 (hereinafter, "Naylor

4 Decl.").  The Paylocity records available to Vox Media reflect an individual's address for the most

5 *recent payment* made by Vox Media to the individual.  *Id*. ¶¶ 5, 10.  Based on his review of the

6 Paylocity data, Mr. Naylor has identified 258 individuals who were paid by Vox Media over the four

7 years prior to the filing of the Complaint and whose most recent address in the Paylocity database is

8 in California.  *Id*. ¶ 7.  For purposes of calculating *the number of putative class members*, this list is

9 *only under-inclusive*.  For instance, this list excludes an individual like Ms. Spruill, who is a putative

10 class member, because her most recent Paylocity address is not in California.  However, the list is not

11 over-inclusive because even if someone performed most of the services for Vox Media in another

12 state over the past four years, and only moved to California a month ago, that individual would still

13 properly be considered a putative class member since the individual performed *some* services for Vox

14 Media in California during the period covered by the Complaint.  Although this list likely

15 *undercounts* the number of putative class members, "[t]his list represents the best available

16 accounting of Content Contributors who worked in California."  *Id*. ¶ 10.[1]

17       This best estimate is sufficient and competent evidence to establish that the class exceeds 100

18 individuals.  A knowledgeable employee's testimony that the class consists of more than 100

19 individuals is sufficient to show class size on removal.  *Taylor v. United Rd. Servs., Inc.*, 313 F.

20 Supp. 3d 1161, 1176 (E.D. Cal. 2018) (finding that Vice President of Human Resources' declaration

21 that the class consisted of between 160 and 182 people during relevant period was sufficient to show

22 by a preponderance of the evidence that the class consists of 100 or more people).

23     **B.**     **Removal Was Proper Because CAFA's Amount-in-Controversy Requirement is**

24         **Satisfied Based On the Allegations in Spruill's Complaint**

25       Plaintiff further contends that Vox Media cannot rely upon the allegations related solely to

26 _____

27 [1]  For purposes of estimating the number of work weeks during which an individual performed

28 services for Vox in California, this list is likely both over- and under-inclusive.  But, as Mr.
Naylor attests, there is no reason to believe that this list is any more over-inclusive than it is
under-inclusive.  *Id.* ¶ 10.

Gibson, Dunn &
Crutcher LLP

Ms. Spruill to calculate the amount in controversy, alleging that some people were paid more than Ms. Spruill and some less; that some worked longer seasons (MLB) and some shorter (NFL).  Mtn. at 8-9.  But in relying upon the allegations in the Complaint, Vox Media reasonably relied upon Spruill's allegations regarding the stipend amount paid and hours worked to extrapolate to the class as a whole.  Indeed, Ms. Spruill alleged in her complaint that "Plaintiff's claims are typical of those belonging to members of the Class . . ."  Compl. ¶ 35.  Moreover, aside from alleging that some content contributors received less than the $200/month Plaintiff received (which would incidentally only *increase* the amount in controversy), the only allegations in the Complaint regarding hours worked or stipends received by class members are those related to Ms. Spruill.  Thus, even assuming that the calculations based on Ms. Spruill's allegations are not the norm, the facts she has noted in her Motion to Remand suggest that calculated damages for Ms. Spruill are not uniformly *higher* than the putative class as a whole.  And, even if the numbers are off slightly, Defendant's Notice of Removal calculated damages at more than $12 million.  Dkt. #1 ¶ 46.

Although the inquiry could end there, Defendant submits additional evidence and explanation of the amount in controversy for purposes of shoring up the reasonableness of its assumptions and erasing any doubt as to whether CAFA's amount-in-controversy requirement is met.  Vox Media submits this additional evidence with the knowledge that "[t]he burden to establish the amount in controversy by a preponderance of the evidence does not require the defendant to 'research, state, and prove the plaintiff's claims for damages.'"  *Donald v. Xanitos, Inc.*, No. 14-CV-05416-WHO, 2015 WL 1774870, at *4 (N.D. Cal. Apr. 17, 2015) (quoting *Korn v. Polo Ralph Lauren Corp.*, 536 F.Supp.2d 1199, 1204-05 (N.D. Cal. 2008)).

**C.    Further Evidence Confirms that the Amount in Controversy Exceeds $5 Million**

The evidence submitted concurrently with this Opposition proves by a preponderance of the evidence that the allegations in the Complaint place more than $5 million in controversy.  It is proper for courts to consider evidence submitted in opposition to a motion to remand, even if such evidence was not included in the original removal notice.  *See Cohn v. Petsmart, Inc.*, 281 F.3d 837, 840, n.1 (9th Cir. 2002); *Korn v. Polo Ralph Lauren Corp.*, 536 F. Supp. 2d 1199, 1205 (E.D. Cal. 2008) ("A court may also consider supplemental evidence later proffered by the removing defendant, which was

Gibson, Dunn & Crutcher LLP

not originally included in the removal notice.").

### 1. Plaintiffs' Minimum Wage Claim Alone Places Nearly $5 Million in Controversy.

Plaintiff seeks three categories of damages and penalties associated with her minimum wage claim: (1) penalties under Labor Code § 1197.1, which provide, on a per person basis, a $100 penalty per pay period for the first alleged intentional violation, and a $250 penalty per pay period for subsequent violations; (2) unpaid minimum wages under Labor Code § 1194; and (3) liquidated damages equal to the amount of the unpaid minimum wages (i.e., doubling the unpaid minimum wages) pursuant to Labor Code § 1194.2. Adding the alleged damages from these three sources results in roughly **$4.7 million** in controversy from Plaintiff's minimum wage claim alone.

As a preliminary matter, it is necessary to define the scope of the putative class Vox Media uses for its calculations of the minimum wage. As discussed above, Mr. Naylor's review of the Paylocity data resulted in the identification of 258 putative class members. However, twenty of those individuals had gaps in payments during the time period between their first Paylocity date and last Paylocity date. Naylor Decl. ¶¶ 16-17. To avoid any dispute regarding the time period these individuals may have performed services for Vox Media, Vox Media has excluded them from amount in controversy calculations altogether. *Id*. ¶ 17. There are therefore 238 individuals who were consistently paid during the period between their earliest relevant Paylocity pay date and their most recent Paylocity pay date (up to September 21, 2018, the last date on which Vox Media collected Paylocity data for the purpose of this analysis). *See id*. ¶¶ 12, 13, 16, 17. The calculation of the amount in controversy throughout this brief is based on these 238 individuals.

### (a) Civil Penalties under Labor Code § 1197.1

California Labor Code § 1197.1 provides for civil penalties where an employer pays an employee a wage less than the minimum wage set by applicable law. The penalties include $100 for each pay period for the first alleged intentional violation and $250 per pay period for subsequent violations. Plaintiff seeks such penalties on behalf of the putative class in her Complaint. Compl. p. 8 & ¶¶ 36-39. Moreover, the Complaint flatly alleges that, "*Defendant's monthly stipend was insufficient to meet the legal minimum wage*." Compl. ¶ 39. Plaintiff's allegation contains no

qualifier suggesting anything less than a 100% violation rate for the putative class. Thus, the calculation for civil penalties put in controversy by the Complaint requires only the number of pay periods and number of putative class members. Vox Media has calculated these alleged Section 1197.1 penalties to be **an estimated $2,106,300.**

To reach this number, Vox Media first calculated the number of workweeks during which the 238 putative class members performed services for Vox Media within the four years of liability alleged in the Complaint. For each individual, Vox Media calculated the time between the earliest pay date (as far back as September 21, 2014, i.e., four years before the Complaint was filed) and the most recent pay date (up to September 21, 2018, on which Vox Media collected Paylocity data for the purpose of this analysis). Naylor Decl. ¶¶ 12-13. The number of days between these two dates represents the estimated time period each individual performed services for Vox Media, and can be found in Column F of Exhibit A to Mr. Naylor's Declaration. *Id.* ¶ 18, Exh. A. Vox Media then summed this column to reach a grand total of 131,127 days worked by the putative class. The number of total days was then divided by 7 to obtain the number of estimated total workweeks worked by the putative class—18,732 workweeks. This is a reasonable method for calculating the number of workweeks: "[a]lthough the number of workweeks was calculated by the length of each class member's employment, not the specific number of weeks each individual employee worked, this does not render the workweek calculation vague or unsupported." *Hernandez v. Nuco2 Mgmt., LLC*, No. 117CV01645LJOJLT, 2018 WL 933506, at *5 (E.D. Cal. Feb. 16, 2018).

Using this total, over the past four years, each putative class member was therefore paid monthly for an average period of 78.7 weeks (18,732 workweeks/238 putative class members= 78.7 workweeks worked by the average class member), or just over 18 months (78.7/52 *12= 18.2). Assuming pay periods twice per month, *see* Cal. Labor Code § 204(a), each of the 238 putative class members would have been paid on average 36 times (18 months x two pay periods per month). The total civil penalties allegedly owed to the putative class would therefore be **$2,106,300**:

| Initial Section 1197.1 Violations | $100 x 238 putative class members x 1 pay period | $23,800 |
| Subsequent Section 1197.1 Violations | $250 x 238 putative class members x 35 subsequent pay periods | $2,082,500 |

| **TOTAL Section 1197.1 Penalties** | **$2,106,300** |
|---|---|

Finally, as with all of Vox Media's estimates, if anything, this figure undercounts civil penalties because it completely excludes the twenty putative class members who were paid sporadically.

**(b)** **Minimum Wages Allegedly Owed and Unpaid Pursuant to Labor Code § 1194**

California Labor Code § 1194 provides that an "employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage." Thus, to calculate the amount put in controversy by Plaintiff's Section 1194 claim, one must estimate minimum wage allegedly due for hours worked by the putative class members in the past four years, less any compensation paid to those individuals as stipends. Given the highly individualized nature of such calculations, in estimating this amount in its Notice of Removal, Vox Media made several assumptions regarding commonalties among the putative class based on Plaintiff's own allegations. *See* Dkt. # 1 at 7-8. However, Plaintiff now attacks several of these assumptions, such as (1) Vox Media's use of an average estimated minimum wage for the putative class, rather than average minimum wage for each putative class member based on the period he or she worked (Mtn. at 9); (2) Vox Media's assumption that all individuals worked the same time periods as Ms. Spruill, rather than different periods for different sports, which may have different length seasons (Mtn. at 8-9); (3) Vox Media's assumption that all individuals worked the same number of hours per week as Ms. Spruill, because Ms. Spruill was an "associate editor," which she contends requires a larger time commitment than being a contributor (Mtn. at 8-9); and (4) Vox Media's assumption that all putative class members received the same stipend as Ms. Spruill (Mtn. at 10).

As explained above (*supra*, pp. 5-6), each of these assumptions is plainly reasonable in light of Plaintiff's representation that her experiences are typical of those of the putative class. Nevertheless, to eliminate any doubt, Vox Media has further analyzed and provided its available data, which includes the time period over which an individual was paid, the league associated with the blog, also known as the "team brand" for which each putative class member performed services, the responsibilities and role of each Content Contributor, and the monthly amount paid to each putative class member. As shown below, even where more individualized data is used, rather than the

Gibson, Dunn &
Crutcher LLP

assumptions Plaintiff challenges in her Motion, the amount placed into controversy by Plaintiff's Section 1194 claim for unpaid wages still exceeds **$1.3 million**.

    ***Calculating the Average Minimum Wage.*** To start, Plaintiff attacks Defendant's use of an average $10 minimum wage over the time period encompassed in the Complaint, (Mtn. at 9-10) but use of this average is both reasonable and appropriate. While "'it is preferable for defendants to calculate the average hourly wage based on the average wage of all class members,' it is often 'unworkable at [an early] stage of the litigation to require defendants to determine the actual individual members of the entire class.'" *Taylor v. United Rd. Servs., Inc.*, 313 F. Supp. 3d 1161, 1179 (E.D. Cal. 2018) (quoting *Helm v. Alderwoods Grp., Inc.*, No. C 08-01184SI, 2008 WL 2002511, at *4 n.3 (N.D. Cal. May 7, 2008), which permitted defendant to rely on the average hourly wage of the 27 named plaintiffs to calculate amount in controversy).

    Regardless, Vox Media has now reviewed the data for the time period each individual was paid by, and thus presumably performed services for, Vox Media, and calculated the estimated minimum wage allegedly owed to each individual. Naylor Decl. ¶ 23. California's statewide minimum wage for employers with more than 26 employees was $9.00 per hour in 2014 and 2015, $10.00 per hour in 2016, $10.50 per hour in 2017, and $11 per hour in 2018. *See* State of California Department of Industrial Relations, *History of California Minimum Wage*, *available at* https://www.dir.ca.gov/iwc/MinimumWageHistory.htm. Thus, Vox Media set the minimum wage for a particular putative class member at $9 if most of the time the individual worked was in 2014 and 2015; $10 if the individual worked the entire time covered by the class period, or worked primarily in 2016; $10.50 if the individual worked primarily in 2017; and $11 if the person worked only in 2018. *See* Naylor Decl. ¶ 23. Although using $10 remains reasonable, Plaintiff cannot quibble with this new breakdown of minimum wage by individual putative class member. This individualized estimated minimum wage rate, which goes beyond what a removing defendant is required to prove (*Taylor*, 313 F. Supp. 3d at 1179), can be found in Column M of Exhibit A to Mr. Naylor's Declaration. Naylor Decl. ¶ 4, Exh. A.

    Notably, the applicable minimum wage in Column M is likely a significant underestimate of the actual minimum wage allegedly owed because, as Plaintiff herself points out, "local jurisdictions

Gibson, Dunn &
Crutcher LLP

may require even higher minimum wages." Mtn. at 9.  Many local jurisdictions in California do set the minimum wage significantly above what the state requires.  Plaintiff herself offers a prime example of this phenomenon.  She was living in Santa Monica while receiving monthly stipends from Vox Media.  Compl. ¶ 5.  In 2017, while the state minimum wage was $10.50 per hour for employers with more than 26 employees, the minimum wage in Santa Monica after July 1, 2017 (during the time Ms. Spruill "worked" for Vox Media) was $12.00 per hour.[2]  Other cities in California similarly have a higher minimum wage than that of the state as a whole: Los Angeles also had a minimum wage of $12.00 per hour beginning July 1, 2017, which increased to $13.25 on July 1, 2018[3]; Oakland's minimum wage in 2017 was $12.86 per hour, increasing to $13.23 in 2018[4]; and San Francisco's minimum wage beginning July 1, 2017 was $14.00 per hour, increasing to $15.00 per hour on July 1, 2018.[5]  Because Vox Media has not included these municipal rates in its calculations, the amounts calculated are almost certainly systematically lower than the alleged amount in controversy.

      ***Calculating the Estimated Hours Worked.***  Ms. Spruill also asserts that Vox Media has unreasonably estimated the number of hours worked per putative class member based on her allegations alone, because she held the purportedly unique position of "associate editor."  Specifically, she argues that site managers and editors have a larger time commitment than contributors; she further asserts that all Content Contributors work more hours around game days and work fewer hours in the off-season.  Mtn. 8-9.  To address these concerns, in this iteration of the data analysis, Vox Media has taken both factors into account—using different weekly hour estimates for

---

[2]   *See* City of Santa Monica, *Santa Monica's Minimum Wage Increases July 1 on the Way to $15 by 2020* (June 27, 2017), *available at* https://www.santamonica.gov/press/2017/06/27/santa-monica-s-minimum-wage-increases-july-1-on-the-way-to-15-by-2020

[3]   *See* Los Angeles Municipal Code, Chapter XVIII, Article 7,  Los Angeles Minimum Wage Ordinance, Sec. 187.02, Payment of Minimum Wage To Employees, *available at* http://clkrep.lacity.org/onlinedocs/2014/14-1371_ord_183612_07-19-15.pdf

[4]   *See* City of Oakland, California, *January 1, 2018 Minimum Wage Increase*, *available at* http://www2.oaklandnet.com/Government/o/CityAdministration/d/MinimumWage/OAK051451

[5]   *See* San Francisco Administrative Code, Chapter 12R, "Minimum Wage Ordinance", Sec. 12R.4. Minimum Wage, *available at* http://library.amlegal.com/nxt/gateway.dll/California/administrative/chapter12rminimumwage?f=templates$fn=default.htm$3.0$vid=amlegal:sanfrancisco_ca$anc=JD_12R.4

Gibson, Dunn &
Crutcher LLP

contributors, Site Managers, and Deputy Managers, and calculating alleged wages owed based only on *in-season* work.

With respect to the different hours purportedly worked by individuals in different positions, Vox Media first identified three broad categories of titles that would fall within the putative class of Content Contributors as described in the Complaint: Site Manager; Deputy Manager; and contributor, the latter of which encompasses a number of individual titles, including blogger, contributor, community, social media, and key contributor. Declaration of John Ness ¶ 6, hereinafter "Ness Decl."

Someone in the role of a Deputy Manager in the designations provided in Column H of Exhibit A to Naylor's Declaration would not have the same responsibility as a Site Manager, but would edit other contributor's work and would create content of his or her own. Ness Decl. ¶ 8. In her alleged role as an "Associate Editor," with job responsibilities that she asserts include reviewing the work of other contributors and creating her own content, (Mtn., Grimes Decl., Exh. 10, Spruill Decl. ¶¶ 7, 10), Ms. Spruill's role appears akin to that of a Deputy Manager. Ms. Spruill alleges that she worked 20 to 25 hours per week during the regular NBA season. Compl. ¶ 21. As such, for individuals with a title of Deputy Manager, *assuming for purposes of removal only that the allegations in the Complaint are true*, Vox Media has estimated that such individuals worked 25 hours per week during the time the team associated with their team brand was in season. *See* Ness Decl. ¶ 8.

Ms. Spruill further claims that she "typically authored one or two articles per week, and at times as many as three to five articles a week," and that "[a] substantial portion of my time was spent editing the work of other [] contributors." Mtn., Spruill Decl. ¶¶ 7,10. Employing a reasonable assumption that 10 hours represents a "substantial portion" of the 20 to 25 hours per week Ms. Spruill claims to have worked in season, that would mean, *taking her assertions as true*, that she spent 10 to 15 hours authoring articles. This, in turn, could lead one to assume that *contributors* covering the NBA regular season, who solely authored articles, worked approximately 15 hours per week during that season. *If* one takes the allegations in Ms. Spruill's Complaint as true only for purposes of estimating the amount in controversy, then 15 hours per week is a reasonable estimate of the time a

contributor might have spent performing services for Vox Media during the time their team was *in season*. Ness Decl. ¶ 6.

Finally, based on the fact that Site Managers' time commitment is greater than that of regular contributors or even Deputy Managers, Vox Media estimates, that *if* the allegations in the Complaint are taken as true, it is reasonable to estimate an individual in the role of a Site Manager could have spent 35 hours per week performing services for Vox Media while their team was in season. Ness Decl. ¶ 7; *see* Mtn. at 7 ("Site Managers, on the other hand, were expected to write blog posts, recruit other writers, edit and schedule posts, and manage the site's social media accounts.").

In short, Vox Media estimates the following hours per week spent performing services ***in season*** for the following roles: Site Manager, 35 hours; Deputy Manager or Editor, 25 hours; and contributor 15 hours. These *estimates* of the amount of time a putative class member in a given role might have spent performing services while their team was in season. These ***estimates*** of hours based on an individual's role are grounded in reasonable assumptions predicated upon the allegations in the Complaint and the declaration of John Ness. This is precisely what is required under the preponderance of the evidence standard.

With respect to the different time periods worked by individuals covering different sports (which in turn have seasons of differing lengths), Vox Media has now factored the sports and seasons associated with each putative class member into the calculation of estimated hours worked. First, based on Vox Media's review of current information, it appears that most contributors cover MLB (major league baseball), NFL (national football league), NHL (national hockey league), MLS (major league soccer), NBA (national basketball league), EPL (English Premier League soccer), and College Sports (encompassing multiple sports at a given school). The length and dates of the regular season for each of these sports is well-known and publicly available. Naylor Decl. ¶ 20. Of course, given that the Vox Media's coverage extends to pre-seasons as well, the pre-season of each sport should also be included when calculating hours worked. Ness Decl. ¶ 10.[6] The method for determining the

---

[6] Evidence submitted by Plaintiff further confirms that the pre-season is appropriately considered in season length job posting provided by Plaintiff for the New York Knicks provided that "There's, at a minimum, 90 games to cover every season (don't forget those 8 preseason games!)." Dkt. # 23, Grimes Decl., Exh. 2, at 1.

Gibson, Dunn & Crutcher LLP

number of weeks "in season" is as follows:

- <u>College:</u> Because college team brands cover multiple sports rather than a single sport, any individuals dedicated to a college team brand were considered to have "in season" work year-round. Forty-five individuals were allocated to "college." Ness Decl. ¶ 4, 11; Naylor Decl. ¶ 22.

- <u>English Premier League (EPL):</u> According to the EPL official website in the 2017 to 2018 season, there were 38 match weeks and each team plays 38 games. Therefore, EPL seasons were set at 38 weeks. There are 7 putative class members who are associated with EPL team brands. Naylor Decl. ¶ 20, Exh. A.

- <u>MLB:</u> Including spring training and the regular season, the MLB season is 31.5 weeks. For purposes of calculating the amount of damages, Vox Media has used 31 weeks as the estimate. There are 54 putative class members associated with MLB team brands. Naylor Decl. ¶ 20, Exh. A.

- <u>MLS:</u> The regular season of MLS soccer is just over 31 weeks; with preseason, it is 35 weeks. There are 12 putative class members who worked on team brands associated with MLS. Naylor Decl. ¶ 20, Exh. A.

- <u>NBA:</u> The NBA regular season is 26 weeks (Mtn., Grimes Decl., Exh. 3) and pre-season is just over two additional weeks (*id.*, Exh. 1, at 2). For purposes of the calculations herein, Vox Media used 28 weeks for the NBA season including pre-season. Thirty-six putative class members are associated with NBA team brands. Naylor Decl. ¶ 20, Exh. A.

- <u>NFL:</u> The NFL regular season is seventeen weeks, and there are four pre-season weeks. In total, the NFL season and pre-season cover 21 weeks. Thirty-one putative class members worked on team brands associated with the NFL. Naylor Decl. ¶ 20, Exh. A.

- <u>NHL:</u> Including preseason, the NHL season is just over 29 weeks. For purposes of calculating weeks worked, Vox Media has used 29 weeks. There were 18 putative class members working on team brands associated with the NHL. Naylor Decl. ¶ 20, Exh. A.[7]

To determine the season associated with each putative class member, Vox Media reviewed information regarding the "league" with which each putative class member's blog or "team brand" is associated. Naylor Decl. ¶ 14. Then, Vox Media analyzed approximately how many in-season weeks each putative class member worked. It did so by analyzing the number of weeks in a given season, including the pre-season (Column J), and then multiplying the number of weeks per season by the approximate number of seasons during which a putative class member performed services for Vox Media (Column K). Naylor Decl. ¶¶ 20-21. The total number of in-season weeks worked is based on multiplying number of seasons worked by weeks per season and is found in Column L.

---

[7] Other contributors performed services for blogs relating to combat sports or other satellite blogs. Because those blogs do not follow a regular season, they have been excluded for purposes of the minimum wage calculations here. Naylor Decl., ¶ 19.

Naylor Decl. ¶ 21.

*Calculating the Stipend Offset.* To the extent any wages are owed to the putative class members under Section 1194, such wages must be offset by any moneys paid to those individuals, i.e., the stipends paid by Vox Media. Vox Media has now included in its analysis an average estimate of the monthly stipend paid to all individuals based on a review of individual data reflecting the monthly stipend amount paid to each individual. This average estimated monthly stipend is $400.

To calculate this average estimated monthly stipend Vox Media began with a list of the stipend payment data for each putative class member. The stipend amount for each individual was, in most cases, based on the most recent stipend payment amount reflected in Vox Media's records. Naylor Decl. ¶ 25. Although stipend amounts may vary over time, they usually increase over time. Naylor Decl. ¶ 25. Thus, using the most recent stipend amount for each individual would likely *overestimate* the amount paid to an individual (ultimately reducing damages calculations for minimum wage claims because the payment offset is higher). Vox Media then took the average of the stipend amounts paid to the 218 individuals associated with a team brand. Naylor Decl. ¶ 25. This average was roughly $320. Naylor Decl. ¶ 25. For a more conservative estimate of the damages allegedly owed to each individual, Vox Media then increased by monthly stipend amount by adding 25%, or an additional $80, to the average for a total figure of $400. Naylor Decl. ¶ 25. The higher the stipend, the lower the alleged damages, and the more conservative the estimate for purposes of calculating the amount in controversy.

Column P contains the estimated average weekly stipend paid to each individual. This was calculated by multiplying the monthly stipend by 12 and then dividing it by 52. Naylor Decl. ¶ 25, Exh. A.

*Calculating the Minimum Wages Allegedly Owed under Section 1194.* With all of the data described above, calculation of minimum wage damages allegedly owed is straightforward. One need only subtract the estimated amount paid to a putative class member during the time her team was in season from the amount purportedly "owed" to her for the hours she performed services while her team was in season.

For example, the data for the putative class member at row 102 of Exhibit A to Mr. Naylor's

Declaration has a first adjusted Paylocity pay date of September 21, 2014 (Column D) and a most recent Paylocity pay date of January 15, 2016 (Column E). This individual worked on a team brand associated with the MLB (Column G) as a Blogger (Column H). Using the estimated 15 hours worked per week *in season* for a contributor, Vox Media calculated the number of hours worked in season for one MLB season of 31 weeks each, which was calculated by comparing the individual's first and last paydate against the MLB season schedule. This number was then multiplied by a $9.00 per hour estimated minimum wage based on when this individual was performing services for Vox Media. Finally, Vox Media used the average estimated stipend amount of $400 per month (Column O), which converts to a weekly stipend of $92.31 (Column P).

| Total wages allegedly earned by Individual No. 102 during *in season* weeks | 15 hours per week x 31 weeks per season x 1 seasons x $9 per hour | $4,185 (Column N) |
|---|---|---|
| Total amount already paid to Individual No. 102 during *in season* weeks | $92.31 weekly stipend x 31 weeks per season x 1 seasons | - $2,861.54 (Column Q) |
| Total amount allegedly owed to Individual No. 102 for *in season* weeks | | $1,323.46 (Column R |

Vox Media performed this same calculation for each of the putative class members, and summed each total amount allegedly owed. The total in unpaid minimum wages allegedly owed under Section 1194 for in season work only is **$1,303,900**. Naylor Decl., Ex. A. at Column R.

**(c)    Liquidated Damages for Alleged Minimum Wage Violations**

California Labor Code § 1194.2 provides that, in certain circumstances, an "employee shall be entitled to recover liquidated damages in an amount equal to the wages unlawfully unpaid and interest thereon." In this way, Section 1194.2 can essentially double any recovery under Section 1194. As such, the liquidated damages Plaintiff seeks under Section 1194.2 would equal **$1,303,900**, i.e., the same amount as the allegedly unpaid wages under Section 1194.

* * *

Totaling the estimated civil penalties under Section 1197.1, the allegedly unpaid wages under Section 1194, and the liquidated damages under Section 1194.2, Plaintiff's minimum wage claim alone places $2,106,300 + $1,303,900+ $1,303,900+ = **$4,714,100** into controversy.

Gibson, Dunn & Crutcher LLP

In estimating the amount placed in controversy by Plaintiff's meal and rest break claims in its Notice of Removal, Vox Media assumed a once-per-week violation rate. Dkt. #1 at 8-9. Plaintiff first attacks this assumption by claiming that Vox Media mischaracterized a case it cited, *Mackall v. Healthsource Global Staffing, Inc.*, No. 16-cv-03810-WHO, 2016 WL 4579099, at *5, as ***approving*** a 50% violation rate as reasonable. Mtn. at 11-12. But Vox Media's Notice of Removal, referencing *Mackall*, did no such thing. Rather, it clearly cited *Mackall* for the proposition that "[f]or purposes of this calculation, we assume a ***one day per week*** violation rate." Dkt. #1, at 8-9 (emphasis added). Plaintiff's attack on the reasonableness of Defendant's calculation of missed meal and rest periods fares no better from there.

California Labor Code § 512(a) provides that an employer may not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes. Wage Order 4 provides that an employer "shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per (4) hours or major fraction thereof." California Labor Code § 226.7 provides that "the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each workday that the meal or rest or recovery period is not provided."

Vox Media's calculation of missed meal and rest periods based on the allegations in the Complaint, the estimated number of hours spent performing services each week in season, and the number of weeks in a given season is reasonable. The Complaint alleges that "Content Contributors regularly work more than three and a half hours per day. Defendant does not authorize or permit Content Contributors to take ten-minute uninterrupted rest periods for every four hours or major fraction thereof worked." Compl. ¶ 26. With respect to missed meal periods, the Complaint alleges that "Content Contributors frequently work over five hours per day without a meal period." Compl. ¶ 27. Finally, the Complaint alleges that "Defendant has never paid Content Contributors with meal

and rest break premiums for its failure to provide meal and rest breaks." Compl. ¶ 28. Finally, the Complaint alleges that Vox Media "has had no policy or practice of providing" meal periods (Compl. ¶ 48) or rest periods (Compl. ¶ 51).

When there are allegations that plaintiffs "regularly" missed meal or rest breaks, that Defendant had no "policy or practice of providing" meal periods or rest periods, and that Defendant "never" provided such breaks, a once-per-week violation rate is reasonable. For instance, in reversing a district court's order granting plaintiff's motion to remand, the Ninth Circuit explained that where the evidence and allegations provided that plaintiffs were "never" allowed meal or rest breaks and that meal and rest periods were "regularly" denied, this would support a once per week violation rate. *Campbell v. Vitran Exp., Inc.*, 471 F. App'x 646, 650 (9th Cir. 2012). Similarly, in *Garza v. Brinderson Constructors, Inc.*, 178 F. Supp. 3d 906, 912 (N.D. Cal. 2016), the court explained, "[i]n this case, plaintiff does not allege that class members were 'never' permitted breaks, but plaintiff does allege that he 'regularly' missed meal breaks and that defendants maintained a 'policy or practice' of both meal and rest break violations. [Defendant's] assumption of one violation per week is reasonable based on the allegations of the SAC." *Id.*

Vox Media recognizes that the once-per-week violation rate is often discussed in the context of full-time employees, and that some putative class members may have been working much less. Ness Decl. ¶ 7. Because the putative class members worked on their own schedules, it is difficult to estimate how their hours were divided within the week. Ness Decl. ¶ 9. Nevertheless, in an attempt to use conservative estimates, and based on the allegations in the Complaint that Content Contributors "regularly" worked more than three and a half hours per day without a rest period and "frequently" worked more than five hours per day without a meal period, Vox Media has halved the violation rate to be one missed meal period every ***other*** week and one missed rest period every ***other*** week. Furthermore, Vox Media has employed this halved violation rate only for ***in season*** workweeks. It has not calculated any alleged damages for meal or rest break violations for any out-of-season weeks.

Using these assumptions, each putative class member is *allegedly* entitled to their minimum wage rate multiplied by the number of weeks "worked" during in season time. The total damages

Gibson, Dunn & Crutcher LLP

sought are therefore, for each putative class member, weeks worked in season (Column L) x the individual's estimated minimum wage (Column M) = (Column S). The sum (Column S) is **$110,767.92.** Naylor Decl. ¶ 30, Exh. A.

### 3. Plaintiffs' Wage Statement Claim Places More than $200,000 in Controversy.

Under Labor Code Section 226(e), for failure to furnish accurate wage statements, an employee may seek the greater of all actual damages or $50 for the initial pay period in which the violation occurs and $100 per employee for each violation in a subsequent pay period, not exceeding an aggregate penalty of $4,000. The statute of limitations for failure to furnish accurate wage statements is one year. *See Falk v. Children's Hosp. Los Angeles*, 237 Cal. App. 4th 1454, 1469 (2015) ("Claims subject to a one-year limitations period, i.e., the wage statement claim, are therefore time-barred.").

Based on Vox Media's good faith review of currently available information, it estimates that there are 155 individuals who performed services as Content Contributors for Vox Media in California during the past year. Naylor Decl. ¶ 8, 30 Exh. A. These individuals were paid over a collective period of 36,758 days in the past year. *Id*. ¶ 30, Exh. A. On average, each individual was therefore paid stipends over a period of just under 8 months, or approximately 16 pay periods, assuming pay periods occur twice monthly, Cal. Labor Code § 204(a). (The calculation is as follows: 36,758/7= 5,251 weeks; 5,251 weeks/155 people =33.9 weeks/person; 33.9/52 *12= **7.8 months per person**). Thus, on average, each individual would allegedly be entitled to $50 for the first violation and $100 for each subsequent violation, e.g., $1,550. A reasonable estimate of the total alleged damages for Plaintiff's wage statement claim is therefore 155 x $1550 = **$240,250**.

Finally, Plaintiff's argument that "Vox provides no basis for its assumption that Class Members worked and were owed wage statements for every pay period within that period" (Mtn. at 14) simply makes no sense. These Class Members were paid *stipends* each month over this time period. It is therefore a reasonable assumption that they performed services during each of these months, and therefore, if considered employees, were entitled to 16 wage statements.

### 4. Attorneys' Fees Further Increase the Amount in Controversy.

Gibson, Dunn & Crutcher LLP

1    Plaintiff does not dispute that attorney's fees are appropriately considered as part of the total

2    amount in controversy.  Plaintiff seeks "reasonable attorneys' fees."  Compl. at p. 13.  Plaintiff's sole

3    contention on this point is that the amount in controversy upon which the calculation of attorney's

4    fees is based is incorrect.  As shown above, that number, with the additional evidence submitted by

5    Plaintiffs is **$5,065,117**.  As such, Plaintiffs' request for attorneys' fees places additional money in

6    controversy.

7          Under Ninth Circuit precedent, the benchmark commonly used for the award of attorneys'

8    fees is 25% of the common fund.  *See Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1029 (9th Cir.

9    1998); *Jasso v. Money Mart Express, Inc.*, No. 11-CV-5500-YGR, 2012 WL 699465, at *7 (N.D.

10   Cal. Mar. 1, 2012).

11         Vox Media denies that any such attorneys' fees are owed to Plaintiff or the putative class and

12   reserves the right to contest the application of the 25% benchmark in this case.  However, for

13   purposes of this jurisdictional analysis *only*, Vox Media relies on Plaintiff's allegations that

14   attorneys' fees are owed.  Applying the 25% benchmark to the allegations in the Complaint,

15   Plaintiffs' request for attorneys' fees, conservatively places an additional approximately **$1.25**

16   **million** in controversy.  The calculation is as follows:  $4,714,100 (minimum wage damages) +

17   $110,767 (meal and rest break) + $240,250 (itemized wage statements) = **$5,065,117.**  Twenty-five-

18   percent of the total alleged damages and penalties for "reasonable attorneys' fees" is **$1,266,279**.

19         Adding the estimated attorneys' fees to the total alleged damages and penalties results in a

20   total amount in controversy of **$6,331,396**.

21         **D.**     **Defendant's Calculations Significantly Undervalue the Amount in Controversy**

22         As explained above, by analyzing only Plaintiff's allegations relating to her minimum wage

23   claims, meal and rest break claims, and wage statement claims, the amount in controversy is over

24   $6.3 million.  This estimate, if anything, significantly undervalues the full amount in controversy for

25   several reasons.  First, the minimum wage damages and meal and rest break penalties are calculated

26   only for in-season work.  Putative class members were paid stipends during the off season, and SB

27   Nation sites continue to post content in the off season.  Ness Decl. ¶ 10.  As such, there are

28   presumably additional amounts in controversy based on putative class members' continued

performance of services during the off-season.

Second, Defendant's calculation does not include the amounts put in controversy by Plaintiff's overtime allegation or Plaintiff's allegation regarding the failure to reimburse for business expenses. These claims presumably put additional amounts in controversy.

Defendant has demonstrated by a preponderance of the evidence that more than $5 million is in controversy. But, should there be any question at the margins as to whether the amount in controversy is satisfied, it is appropriate to consider that Plaintiffs have alleged additional claims not included in the analysis above. Presumably, based on the allegations in the Complaint, such claims would add to the amount in controversy.

## V. CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion to remand.

Respectfully submitted,

Dated: January 4, 2019

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Katherine V.A. Smith*
     Katherine V.A. Smith

GIBSON, DUNN & CRUTCHER LLP
Katherine V.A. Smith, SBN 247866
ksmith@gibsondunn.com
Elizabeth A. Dooley, SBN 292358
edooley@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

GIBSON, DUNN & CRUTCHER LLP
Jason C. Schwartz (*pro hac vice* application
   forthcoming)
jschwartz@gibsondunn.com
Greta B. Williams, SBN 267695
gbwilliams@gibsondunn.com
1050 Connecticut Ave., N.W.
Washington, D.C. 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

***Attorneys for Defendant Vox Media, Inc.***

# DECLARATION OF SERVICE

I, Robin McBain, declare as follows:

I am employed in the County of San Francisco, State of California, I am over the age of eighteen years and am not a party to this action; my business address is 555 Mission Street, Suite 3000, San Francisco, CA 94105-0921, in said County and State. On January 4, 2019, I served the following document(s):

**VOX MEDIA, INC.'S OPPOSITION TO PLAINTIFF'S MOTION TO REMAND**

**DECLARATION OF JAMES NAYLOR IN SUPPORT OF OPPOSITION TO PLAINTIFF'S MOTION TO REMAND**

**DECLARATION OF JOHN NESS IN SUPPORT OF OPPOSITION TO PLAINTIFF'S MOTION TO REMAND**

**[PROPOSED] ORDER DENYING PLAINTIFF'S MOTION TO REMAND**

on the parties stated below, by the following means of service:

### *Attorneys for Plaintiffs*

David Borgen (SBN 099354)
dborgen@gbdhlegal.com
Laura L. Ho (SBN 173179)
lho@gbdhlegal.com
Ginger L. Grimes (SBN 307168)
ggrimes@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
300 Lakeside Drive, Ste. 1000
Oakland, CA 94612
Tel: (510) 763-9800
Fax: (510) 835-1417

☑ **BY ELECTRONIC TRANSFER TO THE CM/ECF SYSTEM**: On the above-mentioned date, I electronically uploaded a true and correct copy in Adobe "PDF" format of the above-listed documents to the United States District Court's Case Management and Electronic Case Filing System (CM/ECF) system. After the electronic filing of a document, service is deemed complete upon receipt of the Notice of Electronic Filing ("NEF") by the registered CM/ECF users.

### *Attorneys for Plaintiffs*

Marc L. Gelman (PA Bar No. 78,857)
mgelman@jslex.com
Maureen W. Marra (PA Bar No. 309,865)
mmarra@jslex.com
James E. Goodley (PA Bar No. 315,331)
jgoodley@jslex. com
Ryan P. McCarthy (PA Bar No. 323,125)
rmccarthy@jslex.com
JENNINGS SIGMOND, P.C.
1835 Market Street, Ste. 2800
Philadelphia, PA 19103

Gibson, Dunn & Crutcher LLP

VOX MEDIA, INC.'S OPPOSITION TO PLAINTIFF'S MOTION TO REMAND--18-CV-06807-PJH

1
Tel: (215) 922-6700
Fax: (215) 922-3524
2

3  ☑  **BY OVERNIGHT DELIVERY**:  On the above-mentioned date, I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses shown above. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier with delivery fees paid or provided for.
4

5

6  ☑  I am employed in the office of Katherine V.A. Smith, a member of the bar of this court, and the foregoing document(s) was(were) printed on recycled paper.

7  ☑  **(FEDERAL)**          I declare under penalty of perjury that the foregoing is true and correct.

8

9
Dated:  January 4, 2019          By:     _/s/ Robin McBain_____
10                                        Robin McBain
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28